WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000

SUSAN COOK *(pro hac vice forthcoming)*
susan.cook@hoganlovells.com
MARLAN GOLDEN *(pro hac vice forthcoming)*
marlan.golden@hoganlovells.com
JACOB YOUNG *(pro hac vice forthcoming)*
jake.young@hoganlovells.com
DELIA SCOVILLE *(pro hac vice forthcoming)*
delia.scoville@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| UNITEDHEALTHCARE OF THE ROCKIES, INC., and CARE IMPROVEMENT PLUS SOUTH CENTRAL INSURANCE COMPANY, | |
| *Plaintiffs*, | Case No. |
| v. | **COMPLAINT** |
| DEAN CAMERON, in his official capacity as Director, Idaho Department of Insurance, | |
| *Defendant*. | |

Plaintiffs UnitedHealthcare of the Rockies, Inc. and Care Improvement Plus South Central Insurance Company (collectively, "UHC") bring this complaint against Defendant Dean Cameron, in his official capacity as Director of the Idaho Department of Insurance ("the Department"), and allege as follows:

## PRELIMINARY STATEMENT

1.      Medicare Advantage plans are regulated exclusively by the federal government, with oversight and enforcement over participating plans' marketing activities vested solely in the Centers for Medicare & Medicaid Services (CMS).  In spelling out the requirements in the Social Security Act for private plan participation in Medicare Advantage, Congress included an express preemption provision making clear that states have no authority to regulate Medicare Advantage plans, with two narrow exceptions not applicable here: initial plan licensing and plan solvency.  42 U.S.C. § 1395w-26(b)(3).  Idaho, like other states, has always heeded this basic demarcation of federal and state power—until just a few weeks ago.

2.      In mid-October, the Idaho Department of Insurance initiated an attempt to usurp CMS's exclusive regulatory authority over Medicare Advantage plans.  Specifically, the agency took the position that it could penalize plans for marketing activities and commissions that fall within the exclusive regulatory authority of CMS.  The Department's actions threaten to undermine Medicare Advantage, an important federal program serving more than 34 million seniors and others nationally. The agency's actions could have the effect of forcing more Medicare Advantage plans to leave Idaho entirely—ultimately harming Idaho consumers.

3.      The Department's actions arise in the context of significant market disruption and pressures.  Medicare Advantage plans face a number of threats to their viability, particularly in rural states like Idaho.  Rising costs and falling reimbursements have forced some Medicare

Advantage plans to pare back their offerings in Idaho dramatically, while others have exited the state's market entirely.  In order to ensure the viability of its Medicare Advantage plans in Idaho, UHC recently made adjustments to its marketing activities and commissions for its Medicare Advantage plans.  UHC's actions are consistent with federal Medicare laws and regulations.  In July 2025, UHC filed with CMS its anticipated commissions in a range of $0 to the maximum amount, thus expressly preserving its ability to reduce or eliminate those commissions for the 2026 plan year.

 4. On October 15, 2025, the Idaho Department of Insurance issued a Bulletin announcing its view that the consumer protection provisions of the state insurance code permit the agency to regulate the marketing activities and commissions offered by Medicare Advantage plans in the State of Idaho.  Two weeks later, on October 28, Director Cameron made good on that threat by issuing a Cease and Desist Order (C&D Order) to UHC, which purported to take effect immediately.  The C&D Order purports to bar UHC from continuing to implement the previously announced adjustments to commissions for some of its Medicare Advantage plans and how UHC was marketing them—even though such changes are fully compliant with federal law and outside of the Idaho Department of Insurance's authority.

 5. The Department's actions are preempted under both express- and implied-preemption principles.  First and foremost, the Social Security Act's express preemption provision specifically forecloses state regulation of Medicare Advantage plans in the circumstances presented here.  42 U.S.C. § 1395w-26(b)(3).  And the Department's effort to interfere with the regulatory requirements spelled out in the Social Security Act and implementing regulations also is preempted under field and obstacle preemption principles, because it alters the terms of participation in Medicare Part C and undermines federal objectives.

6.     UHC brings this lawsuit seeking a declaration that the Department's efforts to regulate Medicare Advantage plans in the manner spelled out in the Bulletin violates the Supremacy Clause.  UHC also seeks temporary, preliminary, and/or permanent injunctive relief enjoining Director Cameron and those working in concert with the Department of Insurance from enforcing against UHC its new Medicare Advantage policy announced in the October 15 Bulletin, including but not limited to the Department's efforts to regulate the marketing of Medicare Advantage plans and commissions paid to agents.

## PARTIES

7.     Plaintiff UnitedHealthcare of the Rockies, Inc. is a corporation organized in Utah with its principal place of business in Utah.

8.     Plaintiff Care Improvement Plus South Central Insurance Company is a corporation organized in Nebraska with its principal place of business in Nebraska.

9.     Director Dean Cameron is the Director of the Idaho Department of Insurance.  Defendant Cameron maintains an office at 700 West State Street, Third Floor, Boise, ID 83720.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331, because this civil action arises under the laws of the United States, and under 28 U.S.C. §§ 2201–02, because this is an actual, justiciable controversy as to which UHC requires a declaration of its rights by this Court and injunctive relief to prohibit the Idaho Department of Insurance from violating the U.S. Constitution.

11.     This Court also has inherent equitable power to enjoin the actions of state officials that violate the U.S. Constitution and federal law.  *Ex parte Young*, 209 U.S. 123, 159–160 (1908); *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022).

12.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because Director Cameron resides in this district and because a substantial part of the events giving rise to UHC's claims occurred in this district.  The challenged state law also purports to govern Medicare Advantage plans in this district.

## FACTUAL BACKGROUND

## I.    Statutory and Regulatory Background

**The Medicare Program**

13.     The Medicare program, enacted in 1965, provides health insurance for individuals 65 years of age and older, some individuals with disabilities under age 65, and individuals with certain conditions such as end-stage renal disease.  The U.S. Department of Health and Human Services, acting through the Centers for Medicare & Medicaid Services (CMS), administers the Medicare program.

14.     Medicare has four Parts.  Medicare Part A generally covers enrolled beneficiaries for inpatient hospital care, skilled nursing facility care, nursing home care, hospice care, and home health care.  Medicare Part B covers enrolled beneficiaries for, among other things, physicians' services, lab tests and outpatient services.  Medicare Parts A and B frequently are collectively referred to as "traditional" Medicare.  Under traditional Medicare, the federal government pays for physicians and other providers and suppliers on a fee-for-service basis.  Medicare Part D, which is optional, helps cover enrolled beneficiaries for the cost of self-administered drugs.

15.     Medicare Part C—relevant here—is also known as the Medicare Advantage program.  The Medicare Advantage program allows private companies approved by CMS to provide all of enrollees' Part A and Part B coverage.  Many Medicare Advantage plans also include Medicare prescription drug coverage under Part D.  Medicare Advantage plans may also offer

additional benefits not available under traditional Medicare when eligible to do so.  For example, the plans may provide lower co-payments and other cost sharing, or offer supplemental benefits such as vision, hearing, and dental care, transportation, and allowances for over-the-counter items.

16.    Medicare Advantage thus offers Medicare beneficiaries the option to participate in private plans with coordinated care and more comprehensive benefits than those available through traditional Medicare.  Medicare Advantage plans take advantage of efficiencies in managed care, save Medicare money, and offer lower out-of-pocket costs for beneficiaries.

17.    The Medicare Advantage program was established in 1997 as the Medicare + Choice program, when Congress enacted the Balanced Budget Act of 1997.  *See* Pub. L. No. 105-33, 111 Stat. 251.  As part of the program, Congress authorized CMS to contract with privately owned and operated Medicare Advantage Organizations (MAOs).  MAOs operate Medicare Advantage plans to provide and arrange for Medicare-covered benefits for Medicare beneficiaries. 42 C.F.R. § 422.4.

18.    A basic bargain underlies the Medicare Advantage program:  The federal government shifts the financial risk of covering beneficiaries (which it would otherwise bear) to privately operated Medicare Advantage plans.  In return, the plans receive a per-member monthly payment for extending coverage for all traditional Medicare services to their enrollees.  42 U.S.C. § 1395w–23(a); 42 C.F.R. §§ 422.304–422.308.

19.    The Secretary of Health and Human Services (acting through CMS) determines a plan's monthly payment by comparing the plan's bid—the plan's estimated cost of providing Medicare-covered services—to a county-level benchmark set by CMS, which is the maximum amount the federal government will pay for providing those services in the plan's service area.  *See* 42 U.S.C. § 1395w–23(a); 42 C.F.R. pt. 422, subpt. F.  The agency arrives at these benchmarks using

county-specific data, and each benchmark serves as a county-level bidding target for Medicare Advantage plans that wish to submit bids to cover beneficiaries in that jurisdiction. In each locale, the benchmark is individualized based on a statutory formula that considers what would be paid for benefits under traditional Medicare. The benchmarks also are subject to other adjustments that account for county-by-county variation in traditional Medicare spending. *See, e.g.*, 42 C.F.R. § 422.258(a).

20. If a Medicare Advantage plan's bid comes in under the relevant benchmark, a portion of the difference is retained by CMS and the rest is remitted to the Medicare Advantage Organization in the form of a rebate. *Id.* § 422.304(a)(3); *see also id.* § 422.266. Medicare Advantage Organizations must use these rebates to pay for supplemental benefits such as lower patient cost-sharing, an out-of-pocket max, and additional benefits (such as dental and vision). *See id.* § 422.266(b). A plan can also use the rebate to buy down the cost of the Part D plan. If a plan's bid is equal to or above the benchmark, its payment from the federal government is the benchmark amount, and the Medicare Advantage plan must increase premiums to cover the amount by which the bid exceeded the benchmark. *Id.* § 422.304(a)(2).

21. Each year, the plan offers a benefit design that it believes will be attractive to potential enrollees and sustainable for the plan. UHC attempts to maintain stability in its plan offering year over year so that it can retain enrollees from year to year. When a plan has significant swings in benefits from year to year it will attract and lose enrollees from one year to the next. This generally results in higher medical costs and/or lower revenue from CMS. If this happens to a significant extent, a plan may not be able to derive sufficient savings to offer attractive benefits to potential enrollees. When this happens, plans may cut benefits, exit counties, or close the plan entirely. Plan instability is also bad for the Medicare beneficiaries enrolled in the plan. When

plans substantially cut benefits or exit the market, enrollees must often shop for a new plan and may need to switch providers. Enrollees may also lose access to care management plans offered by their prior Medicare Advantage plan. This disruption can be particularly challenging for Medicare beneficiaries.

22.    This structure works to achieve the goals that Congress intended for Medicare Advantage, which include broadening "the range of benefit choices available to enrollees . . . and the opportunity to share in savings where MA plans can deliver benefits at lower costs." 70 Fed. Reg. 4,588, 4,589 (Jan. 28, 2005).

23.    To ensure the federal government retains sole authority over the Medicare Advantage program, Part C of the Medicare Act includes an express preemption provision. In 2003, Congress amended the express preemption provision to clarify its breadth through the Medicare Modernization Act (MMA). *See* Pub. L. No. 108-173, 117 Stat. 2066. Under the MMA, Congress vests exclusive regulatory power over Medicare Advantage plans in the federal government, save for two narrow exceptions where states may still regulate:

> The standards established under this part shall supersede *any* State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. § 1395w-26(b)(3) (emphasis added).

24.    When Congress enacted this provision, it stated that its purpose was to "clarif[y] that the MA program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Rep. No. 108-391 at 557.

25.    Through regulation, CMS has echoed the Medicare statute's preemption provision, asserting that federal standards applicable to Medicare Advantage plans "supersede any State law

or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to the MA plans that are offered by MA organizations."  42 C.F.R. § 422.402.

26.    In guidance, CMS has taken an expansive view of the Medicare Act's preemption provision.  Medicare Managed Care Manual, ch. 10 § 30.1, https://www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/mc86c10.pdf.  As CMS has explained, "[a]ll State standards, including those established through case law, are preempted to the extent that they would specifically regulate health plans (including MA plans), with the exceptions of State licensing and solvency laws."  *Id.* § 30.2.  In preamble guidance, CMS has further explained that "licensure and solvency requirements cannot be used as an indirect method of imposing State regulatory requirements that a State might impose on non MA health plans" and "cannot be used as an indirect way to regulate MA plans by imposing requirements not generally associated with licensure."  70 Fed. Reg. 4,588, 4,664–65 (Jan. 28, 2005).

27.    Medicare Advantage Organizations often enter into contracts with agents or brokers who sell their plans to Medicare beneficiaries.  CMS requires Medicare Advantage Organizations to "ensure they meet the requirements" under agency rules "in order to pay compensation" to "independent agents and brokers."  42 C.F.R. § 422.2274(d).  Those regulations comprehensively set out general rules, requirements for plan-year-specific compensation, recovery of already-paid compensation, and "[o]ther compensation scenarios."  *Id.*  CMS also issues guidance on a year-by-year basis, setting certain rates and instructing Medicare Advantage Organizations on how to comply with their federal obligations.[1]

---

[1]  *E.g.*, CMS, *Contract Year 2026 Agent and Broker Compensation Rates, Referral/Finder's Fees, Submissions, and Training and Testing Requirements* (June 18, 2025) (2026 Compensation Memorandum), https://tinyurl.com/fsvyd68v.

28.    Every year, Medicare Advantage Organizations disclose to CMS the amounts (or ranges of amounts) that they intend to compensate independent agents or brokers to market their Medicare Advantage plans.  This compensation data, which may be reported in the form of either a specific rate or range of rates, is published by CMS on an annual basis.[2]  Very typically, Medicare Advantage plans will provide a range of commissions from the minimum ($0) to the maximum amount allowed by CMS.  Historically, Medicare Advantage plans have adjusted, reduced, or even eliminated commissions mid-year within those ranges without complaint from CMS.

**Idaho's Medicare Advantage Market**

29.    UHC has operated Medicare Advantage plans in Idaho since 2009.  For over fifteen years, UHC has consistently offered reliable coverage and benefits to meet the evolving needs of the Medicare beneficiaries its plans serve, including the state's large rural population.

30.    Today, more than 200,000 Idahoans choose Medicare Advantage, which represents more than half of all Medicare beneficiaries in the state.

31.    Over the last several years, rising costs and reduced government funding have forced Medicare Advantage plans industry-wide to make difficult decisions about where to continue operating and how to design benefits for enrollees, particularly in rural states.[3]

32.    The Medicare Advantage market in Idaho has felt the effects of this pressure.  Several Medicare Advantage plans have ceased operating in large swaths of the state, others have closed plans and reopened new plans with fewer benefits and higher premiums, and some have

---

[2]  CMS, Agent Broker Compensation, https://www.cms.gov/medicare/health-drug-plans/managed-care-marketing/medicare-marketing-guidelines/agent-broker-compensation (updated Sept. 4, 2025).

[3]  *Health Insurers Are Reducing Medicare Advantage Options Next Year*, Newsweek (Oct. 6, 2025), https://www.newsweek.com/health-insurers-are-reducing-medicare-advantage-options-next-year-10836919.

withdrawn from Idaho entirely.[4]  These plan closures alone have resulted in approximately 100,000 Idahoans losing coverage in recent years.

33.    Despite these headwinds, UHC opted to remain in the Idaho Medicare Advantage market for 2026.  In order to remain viable in the Idaho market, UHC adopted a more measured approach to its plan offerings and has also adjusted broker commissions on new enrollments and how those plans are marketed through third party brokers.  The changes made by UHC were fully consistent with the federal Medicare statute and implementing guidance and regulations, including those governing plan marketing and agent commissions.  The decision regarding commissions for the 2026 plan year was communicated to agents though contract amendments in advance of the open enrollment period.

34.    UHC's actions were not driven by a goal of disadvantaging or cutting out agents— they were made with the goal of preserving access to Medicare Advantage coverage for current and future Idaho beneficiaries.

35.    Early signs suggest that 2026 enrollment in UHC's Medicare Advantage plans will be strong; in the first few weeks of open enrollment, UHC has seen an increase in its Idaho Medicare Advantage plan membership enrollment over prior years—an indicator that Idaho beneficiaries continue to have access to high-quality, sustainable UHC Medicare Advantage plan options.

**Idaho Moves To Regulate Medicare Advantage Plans**

36.    On October 15, 2025, the Idaho Department of Insurance released a bulletin purporting to "clarify" the State's position on "unfair trade practices that lead to manipulation of the

---

[4] *Insurance Providers Cut Medicare Advantage Plans In A Major Senior Population Center*, Northwest Public Broadcasting (Oct. 9, 2025), https://www.nwpb.org/local/2025-10-09/insurance-providers-cut-medicare-advantage-plans-in-a-major-senior-population-center.

insurance market and withholding or denying access to products from Medicare-eligible consumers, and the applicability of Idaho Code § 41-1321 to such practices."[5]

37.     In the bulletin, the Idaho Department of Insurance announced its intention to apply the consumer-protection provision of the state's insurance code to the marketing activities of Medicare Advantage plans.  *See* Idaho Code § 41-1321(1).  The State characterized its policy as "not new law" but rather "an agency interpretation of existing law."  And it announced its new policy that "to maintain fair competition in the" Medicare Advantage market, "carriers must" take the following steps related to the marketing of Medicare Advantage plans in Idaho:

      a.      make available (and easily accessible) their applications for enrollment in all forms, including printed, on-line on their website, and through their appointed agents;

      b.      not engage in activity convincing or suggesting that their products not be sold, marketed or discouraging enrollment;

      c.      not change compensation or commissions mid-year;

      d.      provide compensation or commissions if the product they filed had built compensation into its rate development.

38.     The Idaho Department of Insurance did not coordinate with any relevant federal partners or agencies before promulgating the Bulletin.  In the words of the Director, "[w]e did not seek permission [from CMS] nor do we think we need to."[6]  The Director also made clear that the

---

[5]  Idaho Department of Insurance, Bulletin No. 25-06, *Unfair Trade Practices in Marketing Insurance Products to Idahoans Eligible for Medicare* (Oct. 15, 2025), https://doi.idaho.gov/wp-content/uploads/ID/B25-06.pdf.

[6]  IMC x Dean Cameron – Director of the Idaho Department of Insurance at 1:32-33, YouTube (Nov. 5, 2025), https://tinyurl.com/fku267ad.

Department "d[idn't] care what [insurance companies] filed with CMS" for the purposes of enforcing the Bulletin.[7]  To the contrary, the Director explained that Idaho "relished leading" Medicare Advantage regulatory reform, and that State Departments of Insurance had the "right and responsibility to regulate Medicare Advantage plans."[8]  And the Director suggested that state laws such as the Bulletin could effectively force CMS's hand, for instance by making the agency "set the floor" on commissions.[9]

39.    Within a week of releasing the bulletin, the Idaho Department of Insurance notified UHC that it had received information that UHC "has actively engaged in tactics to limit the number of [MA] plans sold in the state" and that the Department had opened an investigation into UHC. Idaho Department of Insurance Letter, Department File No. 33450 (Oct. 21, 2025).

40.    The letter posed several questions related to the marketing of UHC's Medicare Advantage Plans in Idaho, including information related to the commissions and compensation of Idaho agents and brokers (known as "producers") with whom UHC has contracted.  *See* Letter at 1–2.  The Department of Insurance gave UHC fourteen days to respond to the letter.

41.    On October 28, prior to the response deadline on its inquiry letter, the Idaho Department of Insurance issued a C&D Order to UHC.[10]  The C&D Order asserts that UHC has been "intentionally limiting access to MA products by curtailing access to MA applications online"; "rescinding agent commissions on MA plans"; and "discontinuing offering commissions to discourage enrollment."  Order at 3, 4.  The C&D Order also alleges that UHC is "disincentivizing

---

[7]  *Id.* at 7:58.

[8]  *Id.* at 12:00, 27:33.

[9]  *Id.* at 28:30.

[10]  Idaho Department of Insurance, *Cease and Desist Order and Notice* (Oct. 28, 2025), https://doi.idaho.gov/wp-content/uploads/DocketIndex/18-4775-25.pdf.

agents from selling MA plans by making enrollment and applications unavailable and by refusing to pay commissions that are being paid by the agents' clients" and by "concealing MA plans from consumers by removing those applications from its website and requiring that applicants fill out a paper application instead and simultaneously making the paper application nearly impossible to obtain by all sales channels." Order at 5. The C&D Order also falsely alleges that a UHC representative "said that UHC was deliberately discouraging enrollment by any means possible" and "affirmed that the elimination of commissions was not about saving money, it was about discouraging enrollment and steering interest away from MA plans."

42.     The C&D Order then asserts that the upcoming conclusion of open enrollment on December 7 meant that "UHC's actions require immediate action." Order at 4. The Order demands compliance with specified action requirements related to the marketing of UHC's Medicare Advantage plans. These include that UHC cease and desist from "limiting or concealing MA plans from Idaho consumers"; "creating any disincentives of any kind to its agents to prevent the sale of MA plans"; "concealing MA plans on its applications either in paper or on its website or otherwise making it onerous to apply for those plans in favor of another plan"; and "altering its contracts with agents to withhold commissions with the intent of manipulating the insurance market and depriving consumers of UHC's products." Order at 6.

43.     UHC spent the next few weeks engaging with the Department of Insurance, explaining why its concerns were unwarranted and why federal law preempts any state effort to regulate commissions offered by Medicare Advantage plans or their related marketing activities. Those efforts to convince the Department of Insurance to stand down have failed.

## IDAHO'S ACTIONS VIOLATE THE SUPREMACY CLAUSE

44.     "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme law of the land . . . anything in the . . . laws of any State to the contrary notwithstanding.' " *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2).

**Idaho's Actions Are Expressly Preempted By Federal Law.**

45.     The Department of Insurance Bulletin, and the regulatory actions flowing from it, are expressly preempted by federal law.  When Congress expressly invalidates state law through the plain language of a statute (or when a federal agency does so in exercise of its regulatory powers delegated by Congress), the state law is invalid to the extent intended by Congress or the agency.  *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996); *City of New York v. FCC*, 486 U.S. 57, 63–64 (1988).

46.     "Express preemption arises when the text of a federal statute explicitly manifests Congress's intent to displace state law." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1031 (9th Cir. 2024) (quotations and citations omitted).  In an express preemption case, the court focuses "on the plain meaning of the preemption provision," because "the plain wording of the clause . . . necessarily contains the best evidence of Congress's pre-emptive intent." *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)).

47.     The plain language of the Medicare Act includes an express preemption provision. Part C of the Medicare Act states:

> The standards established under this part shall supersede *any* State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. § 1395w-26(b)(2) (emphasis added).

48.     Through regulation, CMS has explained that the Medicare statute's preemption provision "supersede[s] any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to the MA plans that are offered by MA organizations."  42 C.F.R. § 422.402.

49.     CMS has reiterated this expansive understanding of the Medicare Act's reach through guidance.  Medicare Managed Care Manual, ch. 10 § 30.1.  ("The scope of Federal preemption is broad. MA standards set forth in 42 C.F.R. § 422 supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans, with the exception of licensing laws and regulations, and laws and regulations relating to plan solvency.  In other words, unless they pertain to licensure and/or solvency, State laws and regulations that regulate health plans do not apply to MA plans offered by MA organizations.").

50.     CMS has also emphasized that the Medicare Act's lone exception for state laws pertaining to licensure or solvency is narrow.  To avoid preemption, those laws must be "limited to State requirements for becoming State licensed, and do not extend to any requirement that the State might impose on licensed health plans that, in the absence of federal preemption, must be met as a condition for maintaining a State license."  *Id.*

51.     State efforts to regulate the marketing and commissions paid by Medicare Advantage plans do not fall within either exception and are therefore preempted.  As CMS explained, "[s]tate licensing laws *do not extend* to rules that govern the activities of health plans on an ongoing basis even if compliance with such requirements is a condition for retaining a State license. . . . [A] State licensing law *may not be written* so as to set forth ongoing marketing, quality assurance, or network adequacy requirements for MA plans. . . ."  *Id.* (emphases added). *See also* Br. of

16

United States as Amicus Curiae at 7–9, *Do Sung Uhm v. Humana, Inc.*, No. 06-35672 (9th Cir. Oct. 29, 2009).

52.    The Ninth Circuit has similarly interpreted the Medicare Act's express preemption provisions broadly.  The court has clarified that generally applicable state consumer protection laws, as well as state common law claims, may fall within the ambit of express-preemption provisions under the Medicare Act—even if they do not exclusively target Medicare Advantage plans on their face.  *Do Sung Uhm v. Humana*, *Inc.*, 620 F.3d 1134, 1149-50 (9th Cir. 2010).  As the Ninth Circuit has explained, "nothing in the statutory text of the [Medicare] Act suggests that a state law or regulation must apply only to a" Medicare Advantage plan to fall within the preemption clause.  *See id.* at 1150 n.25 (citing *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323 (2008), which reached the same conclusion about a similar express-preemption provision in the Medical Device Amendments to the Food, Drug, and Cosmetic Act).

53.    Relatedly, under Ninth Circuit precedent, state laws need not be inconsistent with the Social Security Act to be preempted by it.  *Aylward v. SelectHealth, Inc*, 35 F.4th 673, 683 (9th Cir. 2022) (holding that Part C's preemption language covers even "state law causes of action that parallel[ ], enforce[ ], or supplement[ ] express standards established under Part C and its implementing regulation").  Thus, where "standards established under Part C expressly prescribe the relevant duties of MA plans with respect to" the conduct at issue, "those standards 'supersede' any state law duty that would impose obligations on MA plans on the same subject."  *Id.*

54.    Both the Social Security Act itself and CMS's implementing regulations set forth "federal standards" within the meaning of the Act's express-preemption provision.  Both the statute and regulations set out detailed standards related to enrollment, eligibility, and election into the Medicare Advantage program.  42 U.S.C. § 1395w-21.  CMS regulations require election forms

and formatting to comply with CMS standards and be subject to CMS approval, 42 C.F.R. §
423.32, and further dictate initial enrollment, open enrollment, and special election periods, *id.* at
§§ 422.68, 422.62(a)(2).

55.     In addition, CMS explicitly regulates the commissions that may be paid by Medi-
care Advantage plans to third-party agents and brokers. 42 C.F.R. § 422.2274.  By regulation,
Medicare Advantage plans "*may* pay compensation *at or below*" fair market value for an initial
enrollment year and "may pay compensation at a rate of up to 50 percent of" fair market value for
each enrollment in a renewal year, among other requirements. *Id.* §§ 422.2274(d)(2)–(3) (empha-
ses added).  The rule also sets standards for recovering compensation in case of disenrollment and
limits the compensation that may be provided when a beneficiary enrolls in more than one plan. *Id.*
§§ 422.2274(d)(4)–(5).

56.     The Social Security Act and CMS's implementing regulations also establish stand-
ards governing Medicare Advantage Organization communications, including marketing and web-
site content requirements. 42 U.S.C. § 1395w-21(h)(4); 42 C.F.R. §§ 422.2263, 2265.  CMS also
has issued extensive guidance regarding plan marketing requirements, such as requiring prior ap-
proval of marketing materials.[11]  CMS guidance also governs the format of enrollment requests,
including a requirement that paper (hard copy) enrollment forms should be made available, alt-
hough plans may also voluntarily elect to offer online enrollment mechanisms.[12]

---

[11] *See Medicare Marketing Guidelines*, CMS (Sept. 10, 2024), https://www.cms.gov/medi-
care/health-drug-plans/managed-care-marketing/medicare-guidelines.

[12] *See CY 2026 Medicare Advantage and Part D Enrollment and Disenrollment Guidance* § 40,
CMS (Aug. 1, 2025), https://www.cms.gov/files/document/cy-2026-cd-enrollment-and-disenroll-
ment-guidance.pdf .

57.    For all these reasons, Idaho's effort to create a parallel system of oversight over Medicare Advantage plan marketing and commissions is expressly preempted by the Medicare statute and its implementing regulations.  *See Aylward*, 35 F.4th at 683; *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernandez*, 58 F.4th 5, 12 (1st Cir. 2023) ("Congress intended for all state laws or regulations that purport[ ] to regulate [Medicare Advantage] plans offered by MAOs ... [to be] preempted.").

**Idaho's Actions Are Also Impliedly Preempted By Federal Law.**

58.    Implied preemption principles lead to the same conclusion.  To start, "ordinary [implied] pre-emption principles" apply even where a statute also contains an express preemption clause.  *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 874 (2000).

59.    Implied preemption analysis comes in various flavors.  Most relevant here are field preemption and obstacle preemption (a subset of conflict preemption).  State action is field preempted where Congress has foreclosed all state regulation in a particular area, and it is obstacle preempted where it obstructs "execution of the full purposes and objectives of Congress." *Ventress v. Japan Airlines*, 747 F.3d 716, 720–721 (9th Cir. 2014) (quotation omitted).  A federal agency may also preempt state action under the same principles, so long as it acts "within the scope of its congressionally delegated authority."  *Cohen v. Apple*, 46 F.4th 1012, 1028 (9th Cir. 2022).

60.    Take field preemption first.  Courts find field preemption where there is: (1) a federal regulatory scheme "so pervasive . . . that Congress left no room for the States to supplement it," or (2) a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona*, 567 U.S. at 399 (quotation omitted).  Both are true of Part C of the Medicare Act and its implementing regulations.

61.     Field-preemption analysis begins with "delineat[ing] the pertinent regulatory field" and "survey[ing] the scope of the federal regulation" within it.  *National Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 734 (9th Cir. 2016).  A field is defined by reference to the effects of both federal and state law.  *See Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 632 (2012) (defining the field "on the basis of the physical elements regulated"); *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105 (1992) (looking "to the effects of the law").

62.     Courts have likened the statute's broad displacement of state law to the doctrine of field preemption.  *Pharmaceutical Care Mgmt. Ass'n v. Mulready*, 78 F.4th 1183, 1207–08 (10th Cir. 2023), *cert. denied*, 145 S. Ct. 2843 (2025); *Pharmaceutical Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 973 (8th Cir. 2021).

63.     There are two exclusively federal fields at issue here.  *First*, federal law regulates enrollment in Medicare Advantage plans.  *See generally* 42 U.S.C. § 1395w–21; 42 C.F.R. §§ 422.60, 422.66, 423.32(b).  *Second*, federal law regulates Medicare Advantage plans' operations, including marketing requirements and agent, broker, and other third-party commissions.  42 C.F.R. §§ 422.402, 422.2274.

64.     Idaho's actions directly implicate the same subjects.  Its order to UHC targets the forms of "applications and commercial access" available to prospective enrollees.  Order at 3.  And it takes issue with UHC's actions concerning "agent commissions."  *Id.*

65.     The "density and detail of federal regulation" in these areas reveals that Idaho's actions "will necessarily interfere with the federal regulatory scheme."  *National Fed'n of the Blind*, 813 F.3d at 734–726.  CMS regulates enrollment all the way down to the "form" or other "CMS-approved enrollment mechanism," for which the agency oversees both the "content and format."  42 C.F.R. § 423.32(b).  The agency's guidance includes detailed instructions for

managing enrollment through both paper and electronic applications—exactly the subjects Idaho has attempted to regulate here.  CMS, *Medicare Advantage & Part D Enrollment & Disenrollment Guidance* §§ 40.1.1–2 (Aug. 1, 2025), https://tinyurl.com/3ap84vrj.

66.     CMS's regulations are equally detailed regarding payment of commissions.  The agency requires Medicare Advantage organizations to "ensure they meet the requirements" spelled out in its regulations "in order to pay compensation" to "independent agents and brokers."  42 C.F.R. § 422.2274(d).  Those regulations include provisions ranging from general rules to plan-year-specific compensation, to recovery of already-paid compensation and "[o]ther compensation scenarios."  *Id.*  CMS adds further detail with annual memorandum guidance setting certain rates and instructing Medicare Advantage organizations about how to satisfy regulatory requirements.[13]  In short, federal law already "speaks directly to the concerns raised" by Idaho's actions.  *National Fed'n of the Blind*, 813 F.3d at 735.

67.     Although Medicare Advantage organizations are subject to extensive regulatory requirements, many of these requirements purposely give organizations free rein to decide details of plan administration and operations.  *See, e.g.*, *Beaumont Foot Specialists, Inc. v. United Healthcare of Tex., Inc.*, No. 1:15-CV-216, 2015 WL 9257026, at *3 (E.D. Tex. Dec. 14, 2015) (explaining that aspects of organizations' third-party contracts are intended to be "freely negotiated with limited CMS oversight").

68.     Part C of the Medicare Act and its implementing regulations were therefore "designed to work as a 'harmonious whole.' "  *Valle Del Sol Inc. v. Whiting*¸ 732 F.3d 1006, 1024–26

---

[13]  *E.g.*, CMS, *Contract Year 2026 Agent and Broker Compensation Rates, Referral/Finder's Fees, Submissions, and Training and Testing Requirements* (June 18, 2025) (2026 Compensation Memorandum), https://tinyurl.com/fsvyd68v.

(9th Cir. 2013) (quoting *Arizona*, 567 U.S. at 401). Federal law prescribes detailed minimum standards, but otherwise carves out areas for Medicare Advantage plans to "stimulate innovation through competition." *In re Avandia*, 685 F.3d at 363. For that reason, "the Federal Government has reserved for itself" the ability to control major factors that bear on Medicare Advantage organizations' costs. *See Arizona*, 567 U.S. at 402. Giving MAOs some discretion in these areas is central to the success of Medicare Part C as a partly privatized alternative to traditional Medicare.

69.    Thus, the "purpose [and] history" of the Medicare Act make clear that states cannot add to federal requirements in these areas. *See, e.g.*, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007). Yet the inevitable effect of Idaho's actions is to make Medicare Advantage plans *less* efficient and *less* competitive by piling on additional layers of regulation that increases organizations' costs. Forcing payment of larger commissions is but one obvious example of this effect. Medicare Advantage organizations cannot achieve their statutory purposes "if they began at a competitive disadvantage." *See In re Avandia*, 685 F.3d at 363. Idaho's actions therefore intrude on exclusively federal fields.

70.    Idaho's actions also run afoul of obstacle preemption principles. State action can neither frustrate federal law's "full purposes and objectives," *Cohen*, 46 F.4th at 1028 (quotation omitted), nor "interfere[ ] with the methods by which . . . federal [law] was designed to reach [its] goal[s]," *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987). Once again, the State's actions here do both.

71.    The reasons Idaho's actions conflict with federal law largely track the reasons it is expressly preempted. That is unsurprising: "[T]he plain language of the Medicare Advantage Act's express preemption clause" evinces Congress's intent to oust "all state laws or regulations that purport to regulate Medicare Advantage plans"—other than the types expressly enumerated.

*Emanuelli Hernandez*, 58 F.4th at 12, 14 (quotation omitted and alteration adopted). So "whatever terminology is used," Congress's intent to be the sole regulator in these areas prevents states from layering on additional regulation. *See id.* at 14. Idaho's actions conflict with that objective.

72.    This dissonance between Congress's design and Idaho's actions manifests in at least three specific conflicts. *First*, Idaho is attempting to punish conduct allowed by federal law. *Second*, the State's effort to apply standards that differ from federal law would disrupt federal uniformity and balance of competing objectives. *Third*, the Government's actions undermine the viability of Medicare Advantage plans in Idaho going forward.

73.    UHC's actions are unambiguously allowed by federal law. CMS provides that "[p]lans **may** develop and offer electronic enrollment mechanisms." CMS, *Medicare Advantage & Part D Enrollment & Disenrollment Guidance* § 40.1.2 (Aug. 1, 2025) (emphasis added), https://tinyurl.com/3ap84vrj. As for third-party commissions, CMS allows Medicare Advantage organizations to "pay compensation at **or below**" fair market value. 42 C.F.R. § 422.2274(d)(2) (emphasis added). And when organizations report compensation structures to CMS, they may include a "**range** of rates" for a particular plan year, rather than committing to "specific rates." 2026 Compensation Memorandum, *supra* n.12, at 2 (emphases added).

74.    Federal law, in other words, intentionally authorizes a *spectrum* of enrollment mechanisms and commission structures, including the possibility of no commissions at all. Leaving such discretion to Medicare Advantage organizations is a key part of allowing them to compete and find ways to provide more efficient health-care coverage. Upon information and belief, CMS has not taken enforcement action in the past when Medicare Advantage plans reduce or eliminate commissions paid to agents or brokers.

75.     This is exactly the situation the Supreme Court confronted in *Geier*:  A federal "standard deliberately provide[s]" a regulated party "with a range of choices."  529 U.S. at 875. In that scenario, a state cannot impose a duty to select particular options within those ranges—that would frustrate important "means-related federal objectives" in stimulating competition.  *Id.* at 881.  Yet Idaho is trying to force UHC to adopt particular enrollment methods and compensation structures despite the ranges allowed by federal law.  That is "a direct challenge" to CMS's regulations and guidance, and thus "federally preempted under conflict preemption."  *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1166 (9th Cir. 2008).

76.     Idaho's adoption of these novel requirements also conflicts with Congress's intent to establish nationwide standards governing Medicare Advantage organizations.  The statute directs the Secretary of Health and Human Services (HHS) to "establish . . . standards" comprehensively governing Medicare Advantage organizations.  *See* 42 U.S.C. § 1395w-26(b)(1).  Congress intended those standards to apply the same way in every state, which is why they must displace all state standards "with respect to MA plans."  *See id.* § 1395w-26(b)(3).  Even in the event a particular state action is deemed to fall outside the textual sweep of that express-preemption provision, the action may still conflict with Congress's goal of subjecting Medicare Advantage plans to nationally uniform standards.  *See, e.g.*, *Geier*, 529 U.S. at 868 (finding state law impliedly preempted even though it was not covered by the federal statute's express-preemption clause); *Forest Park II v. Hadley*, 336 F.3d 724, 733 (8th Cir. 2003) (finding state law impliedly preempted in the alternative where it was also expressly preempted).

77.     Idaho's actions effectively seek to carve Idaho out of the nationwide regulatory rules Congress created.  If it carries out its threatened sanctions, the result will be that in Idaho— but no other state—Medicare Advantage organizations must employ particular enrollment

methods and compensation structures. That effect would interfere with the nationwide uniformity of regulation that is the aim of the Medicare Act. *Cohen*, 46 F.4th at 1031.

78.    Congress gave the HHS Secretary exclusive authority to regulate Medicare Advantage organizations, 42 U.S.C. § 1395w-26(b)(1), and he exercises that authority through CMS. Idaho's actions derogate CMS's "statutory monopoly on enforcement authority" by pursuing "enforcement beyond what [CMS] has deemed appropriate." *Nexus Pharms., Inc. v. Central Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022). Carried to their logical conclusion, these actions "risk creating a fragmented patchwork" of state-specific Medicare Advantage standards—exactly the opposite of what Congress intended. *Ventress*, 747 F.3d at 722.

79.    Finally, Idaho's actions here threaten to nullify the most fundamental of Congress's objectives in creating Medicare Part C: offering Medicare Advantage plans to Idaho seniors in the first place. Idaho's actions occur against the backdrop of significant volatility in the Idaho Medicare Advantage market, which has led other organizations to close plans or reopen new plans with fewer benefits and higher premiums.

80.    If Idaho succeeds in forcing compliance with additional state requirements, its actions will increase costs and regulatory uncertainty—ultimately jeopardizing the continued feasibility of Idaho Medicare Advantage plans. For this reason, too, Idaho's actions are preempted by federal law under obstacle preemption principles.

### IDAHO'S ACTIONS CAUSE UHC IMMEDIATE AND IRREPARABLE HARM

81.    UHC will suffer immediate and irreparable harm if the State is permitted to continue to regulate Medicare Advantage plans.

82.    The Bulletin and C&D Order put UHC in a lose-lose situation. On the one hand, complying with the State's mandate will require UHC to expend significant resources to satisfy

25

requirements imposed by an unconstitutional exercise of state authority.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  There is no way for UHC to recover these compliance costs.

83.    Being subject to an unconstitutional law is itself a significant irreparable harm. *American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (holding that being forced to agree to "conditions which are likely unconstitutional because they are preempted" constituted irreparable injury).  That is especially so here, where the Bulletin and C&D Order undermine UHC's ability to rely on rights conferred by federal law to structure its conduct.

84.    On the other hand, failing to comply with the Bulletin and C&D Order exposes UHC to costly enforcement actions and severe penalties.  *See* Idaho Code §§ 41-1327, 41-117. The Director of the Department of Insurance has threatened to impose additional, extra-statutory charges such as retroactive commission payments under the Bulletin.[14]  Regardless of the ultimate penalty imposed, any enforcement action will require UHC to expend significant resources defending against the State's enforcement efforts.  It is unclear that those sanctions or costs could ever be recovered.

85.    Injunctive relief will preserve the status quo and cause no harm to Director Cameron.  *See, e.g.*, *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Ca. 2020) (noting that an injunction would "preserve the *status quo ante*" and cause "no new harms" to the State); *id.* at 771 ("[T]he reach of [the State's] interest ends where the preemptive effect of federal law begins.").  States generally have, at most, a *de minimis* interest in enforcing laws and policies deemed unconstitutional for any reason.  *See, e.g.*, *Association for Accessible Meds. v. Bonta*, 562 F. Supp.

---

[14]  IMC x Dean Cameron, *supra* n.6, at 13:34.

3d 973, 988 (E.D. Ca. 2021) (noting that if "a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper'" (citation omitted)).

86.     Injunctive relief will also serve the public interest by maintaining the integrity of a carefully planned federal program.  *See United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) (recognizing that "preventing a violation of the Supremacy Clause serves the public interest"); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest.").  Likewise, "it would not be equitable or in the public's interest" for the state "to violate the requirements of federal law." *Valle del Sol*, 732 F.3d at 1029.

87.     Injunctive relief will further serve the public interest by preserving the stability and sustainability of UHC's existing Medicare Advantage plans.  UHC is one of a handful of remaining operators of Medicare Advantage plans in Idaho, where more than 200,000 state residents choose such plans.  UHC's Medicare Advantage plans provide much-needed, high-quality health plan coverage to underserved Idahoans.  The Bulletin and C&D Order disrupt UHC's ability to effectively balance the competing pressures related to Medicare Advantage plan provision, and by extension disrupts UHC's ability to properly serve the Medicare beneficiaries it enrolls.

### COUNT I
### (Express Preemption)

88.     UHC realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully within.

89.     Federal law is "the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

90.     Congress determined that the Medicare Advantage program must be regulated by its exclusive governance, an intention made manifest by the express-preemption provision within

the Medicare Act.  And CMS implemented regulations that set forth federal standards related to Medicare Advantage programs and plan marketing, including provisions governing commissions that may be paid by Medicare Advantage plans to third-party agents and brokers.  Thus, under binding Ninth Circuit precedent, states are not free to impose any additional legal or regulatory requirements in this space, even if those requirements are not inconsistent with federal law.

91.     The State's effort to regulate Medicare Advantage plans—as foreshadowed in the Bulletin—directly contravenes that prohibition.  By constraining what Medicare Advantage plan providers can and cannot do with respect to commission payments, enrollment decisions, and marketing practices (among other things), Idaho's interpretation of the law "impose[s] obligations on MA plans on th[e] same subject" as the federal statute and its implementing regulations.  *Aylward*, 35 F.4th at 681.  The Bulletin, C&D Order, and related regulatory actions are therefore expressly preempted by superseding federal law.

92.     For all these reasons, Idaho's attempted enforcement of its views on marketing and commissions provided by Medicare Advantage plans is unlawful and violates the Supremacy Clause of the U.S. Constitution.

## COUNT II
### (Federal Field Preemption)

93.     UHC realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

94.     Congress has determined that the fields of enrollment in Medicare Advantage plans and the operations of Medicare Advantage plans—including agent, broker, and other third party commissions—must be regulated by its exclusive governance.

95.     As evidence of this determination, Part C of the Medicare Act and its implementing regulations pervasively regulate these fields.  The density and detail of federal standards in these fields makes clear that the standards leave no room for state supplementation.

96.     The federal government also has a dominant interest in allowing MAOs to compete and innovate, in order to find ways to provide Medicare benefits more efficiently.  Federal regulation in these fields operates as a comprehensive, harmonious whole, facilitating the competition that Congress sought to promote.  State regulation in these fields cannot coexist with the federal government's dominant interest, particularly where it would frustrate competition by curtailing regulated parties' discretion.

97.     Idaho's actions in issuing the Bulletin and the C&D Order intrude on these exclusively federal fields.

98.     Idaho's actions therefore violate the Supremacy Clause of the U.S. Constitution.

## COUNT III
### (Federal Conflict Preemption)

99.     UHC realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

100.    Idaho's actions repeatedly frustrate the purposes of Part C of the Medicare Act and its implementing regulations, and they impede the implementation methods Congress and CMS have adopted to achieve these purposes.

101.    Idaho's actions seek to punish conduct federal law deliberately allows.

102.    Effectuating these sanctions would also amount to creating Idaho-specific standards for Medicare Advantage enrollment and plan operations, disrupting Congress's uniform, nationwide scheme for regulating these areas.

103.    And Idaho's actions may ultimately threaten the viability of UHC's Medicare Advantage plans in the state by forbidding adjustments that are necessary to ensure UHC's plans can continue to prioritize stable premiums and benefits.

104.    In each of these ways, Idaho's actions pose insurmountable obstacles to achieving the full purposes and objectives of Congress and CMS.

105.    Idaho's actions therefore violate the Supremacy Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

For the foregoing reasons, UHC prays for the following relief:

A.    A declaration under 28 U.S.C. § 2201 that Idaho's efforts to regulate Medicare Advantage plans are unlawful and violate the Supremacy Clause of the United States Constitution;

B.    Temporary, preliminary, and/or permanent injunctive relief vacating the Department of Insurance Bulletin, the C&D Order, and related agency actions, and enjoining the Department from implementing or enforcing its regulatory position against UHC or any of its affiliates, officers, agents, representatives, or contractors;

C.    Temporary, preliminary, and/or permanent injunctive relief enjoining the Department from seeking civil penalties, equitable relief, or any other remedy arising from an alleged violation of the Bulletin, the C&D Order, or the regulatory actions flowing from either, by UHC or any of its affiliates, officers, agents, representatives, or contractors;

D.    An order awarding UHC its costs, expenses, and attorneys' fees incurred in these proceedings; and

E.    Such other and further relief as the Court deems proper.

Dated: November 21, 2025

Respectfully submitted,

*/s/ Wendy J. Olson*

Wendy J. Olson
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
wendy.olson@stoel.com

Susan Cook*
Marlan Golden*
Jacob Young*
Delia Scoville*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff UHC HealthCare*

*\*Motion for admission pro hac vice forthcoming*