UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITEDHEALTHCARE OF THE ROCKIES, INC, a Utah corporation; and CARE IMPROVEMENT PLUS SOUTH-CENTRAL INSURANCE CO., a Nebraska corporation, <br><br> Plaintiffs, <br><br> v. <br><br> DEAN CAMERON, in his official capacity as Director of the Idaho Department of Insurance, <br><br> Defendant. | Case No. 1:25-cv-00665-DCN <br><br> **MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are two motions. UnitedHealthcare of the Rockies and Care Improvement Plus South-Central Insurance Co. (collectively "UHC") seek a preliminary injunction barring Dean Cameron, in his official capacity as Director of the Idaho Department of Insurance ("the Director), from enforcing Idaho laws against it. Dkt. 10. The Director, meanwhile, asks the Court to dismiss UHC's Complaint. Dkt. 14. The Court conducted a consolidated hearing with the factually-related Case No. 1:25-cv-00638-DCN, *PacificSource Community Health Plans v. Cameron* ("the PCHP case") on January 15, 2026. Dkt. 25. Upon review, and for the reasons which follow, the Court GRANTS UHC's

MEMORANDUM DECISION AND ORDER - 1

Motion for Preliminary Injunction and DENIES the Director's Motion to Dismiss.

## II. BACKGROUND

UHC is an "MA organization;" that is, it is a specialized insurer offering Medicare Advantage insurance plans ("MA plans"). *See* 42 C.F.R. § 422.2. Like traditional Medicare, MA plans offer federally subsidized health insurance to senior citizens. Unlike traditional Medicare, however, MA plans are offered through private insurers.

New customers can sign up for MA plans through Medicare.gov, by contacting the MA organization directly, or through insurance brokerages. To incentivize brokers to send new business their way, MA organizations (like most insurers) typically pay brokers a commission for directing customers to their plans. Congress has directed the Secretary of Health and Human Services, acting through the Centers for Medicare and Medicaid Services ("CMS"), to regulate the compensation MA organizations pay brokers. 42 U.S.C. § 1395w-21(j)(2)(D); 42 C.F.R. § 422.2274. CMS has set a ceiling on the amounts MA organizations can pay brokers, but it has not set a floor. *See* 42 C.F.R. § 422.2274(d) (*see also* Dkt. 13 (CMS position paper noting that MA organizations may set brokerage commissions at $0)).

In theory, Medicare Advantage leverages the power of the free market to give senior citizens better and more flexible insurance options when compared to traditional Medicare. Yet its quasi-public character creates conflicting regulatory interests. The federal government has an interest in ensuring that Medicare is substantially the same across the country—whether delivered through traditional Medicare plans or MA plans. But states

have an interest in protecting their residents from unscrupulous private insurers, whether the insurer offers traditional marketplace plans or MA plans.

UHC's case, along with the PCHP case, place that conflict at the fore. The Director believes UHC and PCHP are manipulating brokerage fees and marketing practices to discourage new enrollments. UHC, meanwhile, argues Congress has expressly preempted the Director's attempts to regulate its brokerage and marketing decisions.

Prior to open enrollment for 2026, UHC notified its brokers that it would not offer them commissions on their Idaho MA plans during the 2026 plan year. Dkt. 10-1, at 9. The Director maintains UHC changed its commission structure as part of a holistic attempt to discourage enrollment in its MA Plans. Dkt. 10-5.

The Director responded to complaints against UHC, PCHP, and other MA organizations by issuing Bulletin No. 25-06. The Bulletin states that MA organizations which discouraged or impeded consumers from enrolling in their MA plans engaged in unfair competition under Idaho Code § 41-1321. The Bulletin listed several activities which the Director believed violate Idaho law. PCHP Dkt. 2-2, at 34–35.[1]

On October 21, 2025, the Director issued UHC an inquiry requesting information under Idaho Code § 41-247. Dkt. 10-7, at 4. After rounds of emails, discussions, and partial disclosures, the Director filed administrative enforcement action 18-4775-25 against UHC, alleging it failed to respond as required by Idaho law. *See generally* Dkt. 10-7.

After the Director submitted his inquiries, but before he opened the administrative

---

[1] The Court takes judicial notice of proceedings in Case No. 1:25-cv-00638-DCN as matters of record in a case on its own docket. *See* Fed. R. Evid. 201(c); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir. 1980).

MEMORANDUM DECISION AND ORDER - 3

enforcement action, the Director issued UHC a cease-and-desist order (the "Order"). The Order notified UHC that it had violated Idaho Code § 41-1321 by indirectly discouraging Idaho consumers from enrolling in its plans. Dkt. 10-5, at 6.

UHC filed the instant suit on November 21, 2026. Dkt. 1. UHC asked the Court to restrain the Director from enforcing the Order or Bulletin 25-06, arguing the Director's regulation was expressly preempted by 42 U.S.C. § 1395w-26(b)(3). Dkt. 10. The Court agreed, and temporarily restrained the Director from enforcing the Order or Bulletin against UHC until the Court could determine whether a preliminary injunction was warranted. Dkt. 18.

While the Court was considering UHC's request for preliminary relief, the Director moved to dismiss. Dkt. 14. UHC responded, Dkt. 20, and the Director replied. Dkt. 22. Because UHC and PCHP raised substantially identical issues in their motions for preliminary relief, and because the Director opposed both motions for substantially the same reasons that he moved to dismiss, the Court ordered a consolidated hearing in both cases together with the Director's motion to strike in PCHP's case. Dkt. 12; PCHP Dkts. 23; 24. The hearing took place on January 15, 2026. Dkt. 25.

The matters are now ripe for review.

### III. LEGAL STANDARD

**A. Dismissal under 12(b)(1): Lack of Subject Matter Jurisdiction**

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss claims for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The objection that a federal court lacks subject matter jurisdiction may be raised by a party, or by a court on its own

MEMORANDUM DECISION AND ORDER - 4

initiative, at any stage in the litigation, even after trial and the entry of judgment. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). "Dismissal for lack of jurisdiction is not warranted to the extent that the complaint pleads facts from which federal jurisdiction clearly may be inferred." *Demarest v. United States*, 718 F.2d 964, 965 (9th Cir. 1983). A Rule 12(b)(1) jurisdictional attack may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

"[I]n a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Id.*

**B. Dismissal under 12(b)(6): Failure to State a Claim**

A complaint should be dismissed under Rule 12(b)(6) if the plaintiff would not be entitled to relief even if the complaint's well-pleaded facts are true and all reasonable inferences are drawn in favor of the plaintiff. *See Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). Factual allegations need not be detailed, but they must be sufficiently plausible "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable . . . ." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Only well-pleaded allegations of fact must be assumed true. Mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do."

*Twombly*, 550 U.S. at 555. Nor is the Court "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

If the Court grants a motion to dismiss, it should also grant leave to amend unless it is beyond doubt that amendment would be futile. *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009).

## C. Preliminary Injunction

The basic function of a preliminary injunction is to "preserve the status quo ante litem pending a determination of the action on the merits." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). "A preliminary injunction is an extraordinary equitable remedy that is 'never awarded as of right." *Garcia v. Cnty. of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025) (citation modified). "A preliminary injunction . . . should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Fraihat v. U.S. Immigration & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation modified). A party seeking a preliminary injunction must clearly demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent injunctive relief; (3) that the balance of hardships tips in plaintiff's favor; and (4) that an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit applies the *Winter* factors on a sliding scale. A party that cannot show a likelihood of success on the merits may nonetheless obtain injunctive relief "if there are serious questions going to the merits; there is a likelihood of irreparable injury to the

MEMORANDUM DECISION AND ORDER - 6

plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). However, "[u]nder *Winter,* plaintiffs must establish that irreparable harm is *likely,* not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis original).

## IV. DISCUSSION

The Director argues the Court should dismiss UHC's case because it failed to exhaust its administrative remedies and becuase *Younger* abstention applies. But UHC exhausted its administrative remedies, and in any case exhaustion would be futile, so exhaustion is not required as a general matter of federal equity practice. The Court cannot abstain under *Younger* because UHC makes a facially conclusive claim to federal preemption and because state remedies would be inadequate. Finally, since the Director does not raise any merits arguments which alter the Court's prior *Winter* preliminary relief analysis, the Court finds UHC is entitled to a preliminary injunction.

### A. Exhaustion of Administrative Remedies

The Director argues UHC must exhaust its remedies under the Idaho Administrative Procedures Act, Idaho Code Title 67, Chapter 52 ("IAPA"). Because UHC did not seek reconsideration under IAPA, the Director argues UHC's cases are not exhausted and thus cannot be heard in federal court. The Court disagrees.

The Director characterizes IAPA as a jurisdictional limitation which applies of its own force to UHC's action. But no federal authority supports the principle that federal courts must apply state exhaustion requirements simply because the plaintiff challenges

MEMORANDUM DECISION AND ORDER - 7

state administrative action through *Ex parte Young*.

The Director appears to assume UHC's challenge is fundamentally a request for direct judicial review of his Orders and Bulletin. Dkt. 22, at 4–5. But that misunderstands the nature of UHC's cases of action in this case.

UHC is making an affirmative claim arising under federal law via federal courts' traditional equity powers: "plaintiffs may sue in equity without a congressionally-provided cause of action to prevent an injurious act by a public officer." *Trump v. Cook*, 2026 WL 1855613, at *11 (U.S. June 29, 2026) (citation modified); *accord Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."); *Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) ("But they are seeking only declaratory and injunctive relief against the Sheriff in his official capacity . . . . To obtain that relief, plaintiffs do not need a statutory cause of action. They can rely on the judge-made cause of action recognized in *Ex parte Young* . . . ."); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *Green Room LLC v. Wyoming*, 157 F.4th 1196 (10th Cir. 2025) (collecting cases).[2]

UHC's claims thus arise under federal law, not Idaho law. For the Director's

---

[2] Under *Armstrong*, the implied cause of action in equity is subject to "express and implied statutory limitations." 575 U.S. at 327. Neither party has asked the Court to find that the Medicare Advantage statutes express a Congressional "'intent to foreclose'" implied equitable relief, *see id.* at 328, and the Court declines to address the issue *sua sponte*.

MEMORANDUM DECISION AND ORDER - 8

exhaustion arguments to find purchase, he must show that some source of federal law incorporates IAPA in this case.

The Supreme Court first discussed the relationship between *Ex parte Young* actions and state administrative exhaustion in *Prentis v. Atl. Coast Line Co.*, 211 U.S. 210 (1908) (Holmes, J.). There, a railroad sought to enjoin an order of the Virginia State Corporation Commission from enforcing a railroad rate schedule, on the grounds the rate schedule violated the Fourteenth Amendment. *Id.* at 223. The Supreme Court rejected the idea that a plaintiff must exhaust all state proceedings before seeking relief in federal court.

> It seems to us clear that the appellees were not bound to wait for proceedings brought to enforce the rate and to punish them for departing from it. . . . They are not to be forbidden to try [the] facts before a court of their own choosing, if otherwise competent. 'A state cannot tie up a citizen of another state, having property within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts.'

*Id.* at 228 (citing, inter alia, *Ex parte Young*, 209 U.S. 123, 165 (1908)). In particular, the Supreme Court stressed that once administrative proceedings were complete, no legal principle would prevent a federal court from hearing the case. *Id.* at 230.

Nonetheless, the Supreme Court held that the railroad's action was premature in that case, since Virginia law gave the Virginia Supreme Court of Appeals authority to decide whether the rates were permissible in the abstract—a legislative or administrative act, but not a judicial one. *Id.* at 287. In doing so, the Court made plain that it was adopting a prudential rule based in comity concerns, rather than any belief that Virginia law provided a rule of decision:

> As our decision does not go upon a denial of power to entertain the bills at the present stage, but upon our views as to what is the most proper and

MEMORANDUM DECISION AND ORDER - 9

orderly course in cases of this sort when practicable, it seems to us that the bills should be retained for the present to await the result of the appeals if the companies see fit to take them.

*Id.* at 232.

The Supreme Court reaffirmed *Prentis*'s holding—and its distinction between legislative and judicial remedies—a few years later in *Bacon v. Rutland R. Co.*, 232 U.S. 134 (1914) (Holmes, J.). Justice Holmes, the author of both opinions, emphasized *Prentis* required exhaustion because the Virginia Supreme Court of Appeals "was given legislative powers, and it was held that in the circumstances it was proper, before resorting to the circuit court of the United States, to make sure that the officials of the state would try to establish an unconstitutional rule." *Id.* at 137. That did not mean an appeal to a court was always (or even presumptively) necessary, however. *Prentis*, Holmes wrote, "laid down expressly that at the judicial stage the railroads had a right to resort to the courts of the United States at once." *Id.* at 137.

The Supreme Court has revisited the application of state administrative exhaustion requirements in subsequent cases, and each time it has made clear that state administrative exhaustion requirements are not binding of their own force in federal court. In *Gibson v. Berryhill*, the Court noted that litigants need not exhaust inadequate administrative remedies. 411 U.S. 564, 575 n.14 (1973).[3] And in its most recent case discussing *Prentis*, the Supreme Court reaffirmed the basic distinction: acts are legislative (and thus entitled

---

[3] As *Gibson* noted, exhaustion was likely not required in that case for another reason: § 1983 plaintiffs generally do not need to exhaust administrative remedies before filing in federal court. 411 U.S. at 574; *see also Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 516 (1982). UHC does not characterize its challenge as a § 1983 action, however.

MEMORANDUM DECISION AND ORDER - 10

to exhaustion requirement protections) when they involve "making of a rule for the future," and acts are judicial (and need not be exhausted) when they pass "on present or past facts and under laws supposed already to exist." *New Orleans Public Service, Inc. v. Council of City of New Orleans* (*NOPSI*), 491 U.S. 350, 372 (1989) (citing *Prentis*, 211 U.S. at 226).

None of these cases characterized state exhaustion requirements as jurisdictional simply because the state required exhaustion in its own courts. Rather, the Court grounded its administrative exhaustion jurisprudence in "equity, comity, and federalism." *Gibson*, 411 U.S. at 573. That should not be surprising. The jurisdiction of federal courts is a matter of federal law, bounded by Article III and acts of Congress. Federal courts "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution." *Cohens v. State of Virginia*, 19 U.S. 264, 404 (1821). 28 U.S.C. § 1331 gives the district courts "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." UHC's suits fall within that grant because it is challenging the Director's actions under federal law. *Shaw*, 463 U.S. at 96 n.14. Indeed, if IAPA were read to limit federal jurisdiction in a manner not contemplated by federal law, it would be preempted and void. *See McClellan v. Carland*, 217 U.S. 268, 281 (1910).[4]

So, the fact that UHC is challenging the Director's action does not mean IAPA *must*

---

[4] Congress can and has required federal courts to observe state exhaustion laws. *See, e.g.*, 42 U.S.C. § 1997e (requiring exhaustion of state administrative remedies before bringing a § 1983 action). And in cases like *NOPSI* and *Younger*, the Supreme Court has limited the timing of federal actions based on state law and state interests. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013). But in both cases, the state exhaustion requirements were incorporated by some source of federal law: Congressional statutes in the former case, and federal common law in the latter.

apply. The question then becomes: do the principles of equity, comity, and federalism announced in *Prentis* and its progeny require the Court to hold this action in abeyance until UHC exhausts all the remedies IAPA gives it?

It is not obvious the Court needs to address the issue. As the Director himself acknowledges, he did not brief the question of whether the Court should apply prudential exhaustion in his opening brief. Dkt. 22, at 5 ("The Department did not make the argument for prudential exhaustion of remedies because it does not need to given the obvious statutory requirement."). Exhaustion is an affirmative defense. *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014), *abrogated in part on other grounds*, *Perttu v. Richards*, 605 U.S. 460, 475 (2025). To the extent the Director intentionally did not raise the issue in his opening brief, the argument is waived. *Martensen v. United States*, 2023 WL 2456350, at *5 (D. Idaho Mar. 10, 2023); *Rush v. Weinstein*, 2022 WL 17487740, at *20 n.17 (D. Idaho Dec. 7, 2022), *aff'd*, 2023 WL 7381459 (9th Cir. Nov. 8, 2023).

Even if the Director had briefed the issue, however, it is far from clear what administrative remedy UHC was required to exhaust. The Director appears to argue UHC failed to exhaust because it did not seek reconsideration. Dkt. 14-1, at 5. But the Court finds it doubtful that reconsideration is among the administrative remedies that a party must exhaust under Idaho law. The same chapter which imposes the exhaustion requirement allows a party to seek judicial review of a final order within 28 days of the order's entry *or* an agency's decision on reconsideration. Idaho Code §§ 67-5271 (requiring exhaustion of administrative remedies); 67-5273 (time for seeking review). Reading the exhaustion requirement to require a party to seek reconsideration would appear to render the

MEMORANDUM DECISION AND ORDER - 12

authorization to seek judicial review within 28 days of the final order surplusage. "The [Idaho] Supreme Court will not construe a statute in a way which makes mere surplusage of provisions included therein." *Sweitzer v. Dean*, 798 P.2d 27, 31 (Idaho 1990).

But even if the Director briefed the issue, and even if reconsideration is a mandatory administrative remedy under Idaho law or federal equity, the Court would excuse the failure to exhaust here. The Supreme Court has recognized three broad categories of circumstances which can excuse a failure to exhaust. *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992), *abrogated in part on other grounds*, *Woodford v. Ngo*, 548 U.S. 81, 91 n.2 (2006).

First, a failure to exhaust may be excused when waiting for administrative remedies would be unreasonable, as when the time for the agency to act is indefinite or when the regulated entity would suffer irreparable harm while waiting. *McCarthy*, 503 U.S. at 146–47. "Second, an administrative remedy may be inadequate because of some doubt as to whether the agency was empowered to grant effective relief," as when "it lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute." *Id.* at 147–48 (citation modified). Finally, "an administrative remedy may be inadequate where the administrative body is shown to be biased or has otherwise predetermined the issue before it." *Id.* at 148.

Assuming that failure to file a motion for reconsideration constitutes a failure to exhaust under IAPA, the failure is excusable under at least two of the three circumstances identified in *McCarthy*. Although the Director has institutional competency to investigate and interpret the impacts of insurers' actions on competition and fairness, "[a]dministrative agencies, and the Executive in general, have no particular expertise in construing such

MEMORANDUM DECISION AND ORDER - 13

statutes." *Briggs v. Sullivan*, 886 F.2d 1132, 1140 (9th Cir. 1989); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01 (2024) ("agencies have no special competence in resolving statutory ambiguities. Courts do."); *accord* Idaho Code § 67-5279(5) (prohibiting Idaho courts from deferring to administrative interpretations of law on judicial review under IAPA). The Director thus lacks institutional competence to determine whether federal law preempts Idaho unfair competition law with respect to Medicare Advantage plans.[5]

Moreover, the record in this case suggests reconsideration would be futile. In moving to dismiss, the Director forthrightly represents that his next step is to file an administrative complaint seeking to revoke UHC's license for its failure to comply with his Order. Dkt. 14-1, at 4. And PCHP sought reconsideration, and the Director failed to act. PCHP Dkt. 20, at 3.[6] It is highly likely—bordering on certain—that if UHC were to seek reconsideration, it would also be denied by operation of law.

The Supreme Court faced a similar situation in *Houghton v. Shafer*, where a plaintiff sought to bring a § 1983 action challenging a correctional policy even though he had not appealed the policy's application to the Pennsylvania Attorney General. 392 U.S. 639, 640

---

[5] That is not to denigrate the Director's familiarity or thoughtfulness with respect to Idaho unfair competition law, IAPA, or even federal Medicare Advantage statutes. The Director is, in all likelihood, a conscientious and diligent public servant. But *institutional competence* is a term of art with a different meaning than *actual knowledge*. Institutional competence focuses on which officers are best suited, by virtue of their office's position within the governmental structure, to make certain conclusions. Within the structure of both the Federal and Idaho state governments, courts are best suited to make conclusions of law.

[6] The Court takes judicial notice of the Director's representations in Case No. 1:25-cv-00638-DCN. *See supra*, n.1.

MEMORANDUM DECISION AND ORDER - 14

(1968). But the Pennsylvania Attorney General made no secret of his intent to reject the plaintiffs' arguments:

> As we understand the submission of the Attorney General of Pennsylvania in this Court, the rules of the prison were validly and correctly applied to petitioner; these rules are further said to be strictly enforced throughout the entire correctional system in Pennsylvania. In light of this it seems likely that to require petitioner to appeal to the Deputy Commissioner of Correction, the Commissioner, or to the Attorney General would be to demand a futile act.

*Id.* The Director's representations in this case (and its behavior toward similarly-situated PCHP), like the Pennsylvania Attorney General's representations in *Houghton*, leave no room for wondering what would happen should UHC seek reconsideration. The Director has made plain he intends to reject UHC's preemption argument; administrative remedies would, therefore, be futile for UHC. *See also Vasquez-Rodriguez v. Garland*, 7 F.4th 888, 895–96 (9th Cir. 2021) (holding that futility could be found when the court can determine that it was "very likely" administrative remedies would have reached a particular result).

Thus, UHC is excused from exhausting any remaining administrative remedies.

## A. *Brillhart* Factors

The Director, in reply, asks the Court to abstain under *Brillhart* because this action will unnecessarily decide state law issues. Dkt. 14-1, at 7. In *Brillhart v. Excess Insurance Company of America*, the Supreme Court held that district courts presented with a request for declaratory relief "should ascertain whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court." 316 U.S. 491, 495 (1942). The Supreme Court reaffirmed *Brillhart* fifty-three years later, holding in *Wilton v.*

MEMORANDUM DECISION AND ORDER - 15

*Seven Falls Company* that courts should apply the factors identified in *Brillhart* (rather than the more stringent *Colorado River* test) to determine whether abstention is appropriate in Declaratory Judgment Act cases. 515 U.S. 277, 286 (1995).

> The Ninth Circuit has expanded the list of factors courts are to consider:
>
> In making such a determination, a district court is to consider a variety of factors, including whether retaining jurisdiction would: (1) involve the needless determination of state law issues; (2) encourage the filing of declaratory actions as a means of forum shopping; (3) risk duplicative litigation; (4) resolve all aspects of the controversy in a single proceeding; (5) serve a useful purpose in clarifying the legal relations at issue; (6) permit one party to obtain an unjust res judicata advantage; (7) risk entangling federal and state court systems; or (8) jeopardize the convenience of the parties.

*Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011). The first three are the *Brillhart/Wilton* factors. *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 & n.5 (9th Cir. 1998).

The Director limits his argument to the first *Brillhart* factor and explicitly concedes the second two are inapplicable. Dkt. 14-1, at 7 n.20. But if the Court finds that federal law preempts Idaho law, doing so does not necessarily require interpretating of Idaho law—indeed, the Court assumes, for the purposes of this order, that the Director's interpretation of *Idaho* law is correct. It is his interpretation of *federal* law with which the Court may disagree.

In any case, *Brillhart/Wilton* abstention is inapplicable if the complaint includes a prayer for relief seeking a coercive remedy which independently falls within the Court's subject matter jurisdiction. *Snodgrass v. Provident Life & Acc. Ins. Co.*, 147 F.3d 1163, 1167–68 (9th Cir. 1998) (dismissal under *Brillhart* is an abuse of discretion if "there are

claims in the case that exist independent of any request for purely declaratory relief, that is, claims that would continue to exist if the request for a declaration simply dropped from the case"). UHC's complaint seeks injunctive relief, Dkt. 1, at 30 (praying for an order enjoining the Director from enforcing the Order), and, as noted above, claims for injunctive relief against public officers fall within 28 U.S.C. § 1331, *see Shaw*, 463 U.S. at 96 n.14, so *Brillhart* is inapplicable.

**B. *Younger* Abstention**

*Younger* abstention requires federal courts to abstain from enjoining pending state proceedings in limited contexts. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72–73 (2013). "*Younger* abstention is appropriate only when the state proceedings: (1) are ongoing, (2) are quasi-criminal enforcement actions or involve a state's interest in enforcing the orders and judgments of its courts, (3) implicate an important state interest, and (4) allow litigants to raise federal challenges." *Roshan v. McCauley*, 130 F.4th 780, 782 (9th Cir. 2025) (quoting *Seattle Pac. Univ. v. Ferguson*, 103 F.4th 50, 63–64 (9th Cir. 2024). "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 781–82. (citation modified) (citing *Spring*, 571 U.S. at 82.).

*1. Ongoing State Proceedings*

"[T]he date for determining whether *Younger* applies is the date the federal action is filed," *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014) (citation modified), so the Court looks to whether proceedings were ongoing on November 21, 2025, the date UHC filed its Complaint. *See* Dkt. 1. The Director issued UHC his Order on October 28, 2025. The time to seek judicial review passed on November

MEMORANDUM DECISION AND ORDER - 17

25, 2025. *See* Idaho Code § 67-5273(2).

The Director argues that proceedings were ongoing as of November 21 because the Order is "perpetual," he intended to file an administrative complaint, and state court remedies remain available. Dkt. 14-1, at 9–11. UHC argues the Court should not view the Order and possible future delicensure proceedings as part of one ongoing proceeding, but rather two distinct proceedings—the former of which has ended, while the latter has yet to begin. Dkt. 20, at 22–24.

Although the Court agrees proceedings on the Order are not rendered perpetual based on the Order's indefinite effects, and the Director's intent to file an administrative action in the future are irrelevant, the Director is correct that the availability of state proceedings preclude relief here. There is a circuit split on whether, for purposes of *Younger* abstention, a party to state administrative quasi-criminal enforcement proceedings must exhaust judicial review before filing suit in federal court. *San Jose Silicon Valley Chamber of Com. Pol. Action Comm. v. City of San Jose*, 546 F.3d 1087, 1093–94 (9th Cir. 2008). The majority view is to understand proceedings as ongoing for *Younger* purposes until state judicial review has ended. *Id.*[7]

The Ninth Circuit briefly joined the majority view in 1993, but the opinion adopting that position was withdrawn. *Id.* at 1093. The Supreme Court has twice assumed, without deciding, that the majority view is correct, *see NOPSI*, 491 U.S. at 369; *Sprint*, 571 U.S. at 78, as has the Ninth Circuit, *ReadyLink*, 754 F.3d at 760. All (or nearly all) of the district

---

[7] To the extent UHC voluntarily declined to seek judicial review and such review is now untimely, the Order remains ongoing indefinitely. *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607–08 (1975).

courts in this circuit which have squarely addressed the issue appear to have adopted the majority view.[8] Thus, although the majority rule is not currently binding, the nigh-unanimous opinion of courts in this circuit treat it as correct. The Court will, therefore, adopt the majority view. For purposes of *Younger* abstention, administrative quasi-criminal proceedings remain ongoing until a party has exhausted judicial review. Because the time to seek judicial review had not expired when UHC filed its complaint, proceedings remain ongoing.

### 2. Quasi-Criminal Civil Enforcement

The Director argues the Order is a quasi-criminal civil enforcement proceeding. Such proceedings are typically initiated by the State in its sovereign capacity to sanction a party for misconduct, are preceded by an investigation, and culminate in a formal charge or complaint. *Sprint*, 571 U.S. at 79–80. The Order was initiated by the State of Idaho through the Director, was preceded by factfinding, and culminated in a formal charge including findings of fact and conclusions of law. Dkt. 10-5. And in almost every case to confront the issue with the benefit of full briefing, cease and desist orders were held a "sanction" within the meaning of *Sprint* and *Younger*.[9] The Court, therefore, finds

---

[8] *Mir v. Kirchmeyer*, 2014 WL 2436285, at *11 (S.D. Cal. May 30, 2014); *Howard Jones Invs., LLC v. City of Sacramento*, 2016 WL 1599511, at *2 (E.D. Cal. Apr. 21, 2016); *Morning Hill Foods, LLC v. Hoshijo*, 259 F. Supp. 3d 1113, 1121 n.9 (D. Haw. 2017); *Phillips 66 Co. v. Sacks*, 409 F. Supp. 3d 972, 993 (W.D. Wash. 2019); *Tang v. Regents of Univ. of California*, 2025 WL 2841681, at *5 (N.D. Cal. Oct. 7, 2025), *appeal dismissed,* 2025 WL 4049191 (9th Cir. Dec. 9, 2025); *Doe v. Bd. of Trs. of California State Univ.*, 2025 WL 3780265, at *7 (C.D. Cal. Dec. 30, 2025).

[9] See, e.g., Altice USA, Inc. v. New Jersey Bd. of Pub. Utilities, 26 F.4th 571, 577 (3d Cir. 2022); Minnesota Living Assistance, Inc. v. Peterson, 899 F.3d 548, 553 (8th Cir. 2018); see also ABC Sand & Rock Co. Inc. v. Cnty of Maricopa, 2016 WL 4507108, at *7 (D. Ariz. Aug. 29, 2016); Wheels Fin. Grp., LLC v. Stolfi, 2025 WL 1938148, at *4 (D. Or. Jan. 7, 2025).

proceedings on the Order qualify as quasi-criminal civil enforcement proceedings under *Younger*.

   *3. Important State Interest*

   In evaluating the state interest, the Court must generally view the interest at a high level of abstraction. *NOPSI*, 491 U.S. at 365–67. In *NOPSI*, the regulated entity argued Louisiana's interest should be evaluated based on the specifics of the action it took: reducing the plaintiff's retail power rate below that necessary to recover its wholesale cost. *Id.* at 365. The Court held that the plaintiff's approach risked collapsing the preemption and *Younger* inquiries; instead, the Court looked to Louisiana's interest in regulating retail rates generally. *Id.* Idaho undoubtedly has an important state interest in the maintenance of fair competition between insurers generally.

   However, the Supreme Court left open the possibility that a facially conclusive claim for federal preemption may obviate the state's interest. *Id.* at 367. The Ninth Circuit has recognized that a preemption claim is facially conclusive (or "readily apparent") in cases where the Supreme Court has already decided the issue, in the context of ERISA's broad, relatively simply preemption provision, "and where the federal regulatory jurisdiction of the employees in a bargaining unit had previously been determined." *Woodfeathers, Inc. v. Washington Cnty., Or.*, 180 F.3d 1017, 1021 (9th Cir. 1999). In determining whether preemption is facially conclusive or readily apparent in other contexts, the Ninth Circuit has looked to whether the case presents an issue of first impression, *id.* at 1022, and whether the arguments are colorable. *Rosales v. Ehnes*, 2010 WL 11603082, at 3 (C.D. Cal. Oct. 25, 2010). To determine whether UHC has a facially

MEMORANDUM DECISION AND ORDER - 20

conclusive or readily apparent claim to preemption, the Court must, therefore, look at the statutes and precedents regarding preemption, as well as the Director's arguments against applying preemption. If the Director presents any colorable argument (or argument of first impression) against preemption, the Court must abstain under *Younger*.

The Ninth Circuit has thoroughly unpacked the Medicare Advantage preemption statute. 42 U.S.C. § 1395w26(b)(3)(A) provides: "The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." "Prior to Congress's amendments to the Medicare Act in 2003, the preemption provision stated that federal standards would supersede state law and regulations with respect to MA plans to the extent such law or regulation is *inconsistent* with such standards, and it identified certain standards that were specifically superseded." *Aylward v. SelectHealth, Inc.*, 35 F.4th 673, 680 (9th Cir. 2022) (citation modified, emphasis in original). "The 2003 amendments struck both that qualifying clause and the enumerated standards from the provision. The Conference Report accompanying the Act explains that, in striking the clause, Congress intended to broaden the preemptive effects of the Medicare statutory regime." *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1149 (9th Cir. 2010) (citation modified).

Thus, § 1395w26(b)(3)(A) preempts "a state law cause of action that parallels, enforces, or supplements express standards established under Part C and its implementing regulation." *Aylward*, 35 F.4th at 681. It does not matter whether the state law is generally applicable. *See id.* (citing *Do Sung Uhm*, 620 F.3d at 1152–53); *see also Do Sung Uhm*,

MEMORANDUM DECISION AND ORDER - 21

620 F.3d 1150 n.25. Nor does it matter whether the state and federal laws conflict. *Aylward*, 35 F.4th at 681.

"[I]n determining what qualifies as a state law 'with respect to MA plans,' . . . our preemption analysis must be based on the relevant state law duty sought to be imposed under the generally applicable law invoked by the [party seeking to enforce state law]." *Id.* (citation modified). When "the standards established under Part C expressly prescribe the relevant duties of MA plans . . . those standards 'supersede' any state law duty that would impose obligations on MA plans on that same subject." *Id.* "Although the term 'standard' is not defined in the Act, at the narrowest cut, a 'standard' within the meaning of the preemption provision is a statutory provision or a regulation promulgated under the Act and published in the Code of Federal Regulations." *Do Sung Uhm*, 620 F.3d at 1148 n.10.

The Order interprets Idaho unfair competition law as imposing three duties on UHC: to pay out commissions, if UHC accounted for commission expenses in developing premium rates (Dkt. 10-5, at 6 (Order, Conclusion of Law (g))); to make enrollment applications available (Dkt. 10-5, at 6 (Order, Conclusion of Law (h))); and to offer both digital and paper applications (Dkt. 10-5, at 6 (Order, Conclusion of Law (i))).

Congress has assigned CMS the responsibility of regulating the compensation MA organizations pay to brokers, 42 U.S.C. § 1395w-21(j)(2)(D), and CMS has issued rules implementing that assignment. 42 C.F.R. § 422.2274(d) (setting ceiling but not floor). A federal standard, therefore, exists with respect to whether and how much UHC must pay brokers in commissions.

MEMORANDUM DECISION AND ORDER - 22

CMS has also issued regulations which impose duties on MA organizations to deliver several kinds of documents to the consumer, 42 C.F.R. § 422.2267(e), including the enrollment form specifically, 42 C.F.R. § 422.2267(e)(6) (defining the enrollment form as a "model" and "required" material), and has specified the manner in which those documents must be delivered, 42 C.F.R. § 422.2267(d) ("MA organizations must mail required materials in hard copy or provide them electronically, following the requirements in paragraphs (d)(1) and (2) of this section."). A federal standard, therefore, exists with respect to UHC's duty to furnish enrollment materials and with respect to the means by which it choses to do so.

Finally, CMS has issued regulations establishing what content must appear on MA organizations' websites. 42 C.F.R. § 422.2265(b) ("MA organization's [*sic*] websites must include the following content . . . (14) Enrollment instructions and forms"). A federal standard, therefore, exists with respect to what materials UHC must include on its website.

None of the Director's arguments against preemption are colorable. The Director argues that "the *Uhm* court reasoned that if a state court were to determine that Humana's marketing materials were misleading, it would directly undermine CMS's prior determination to the contrary, which is a lynchpin to the preemption inquiry." Dkt. 17, at 7.[10] But the Ninth Circuit has specifically rejected the idea that a state law must

---

[10] The Director reiterates that position a few pages later when he argues, based on *California ex rel. Lockyer v. Sempra Energy Trading*, 292 F. App'x 676, 678 (9th Cir. 2008), that *Do Sung Uhm*'s reasoning was predicated on the idea that the MA preemption statute preempts only those state laws which would directly undermine federal law. Dkt. 17, at 9–10. But *Do Sung Uhm* explicitly refused to endorse that exact proposition, 620 F.3d 1149–50; *see also id.* at 1150 n.24, and in any case *Aylward* rejected the proposition outright, 35 F.4th at 681 (holding preemption applied to state law causes of action which parallel, enforce, or supplement federal standards).

MEMORANDUM DECISION AND ORDER - 23

undermine—directly or otherwise—CMS to fall within the Medicare Advantage preemption provision. *Aylward*, 35 F.4th at 681 ("Therefore, we must decide whether Part C's preemption provision preempts a state law cause of action that parallels, enforces, or supplements express standards established under Part C and its implementing regulation. We conclude that it does."). The Director's argument that only state laws which undermine CMS are preempted is squarely foreclosed by *Aylward*.

The Director also implies that since CMS lacks a standard specifically describing business or unfair trade practices, the Director can regulate in that space. Dkt. 17, at 9. But that argument does not follow from the source cited, and Ninth Circuit case law precludes it regardless. The Director supports his argument that he can regulate unfair business practices in the absence of a CMS standard on point by citing *In re Western States Wholesale Natural Gas Antitrust Litigation*, 346 F. Supp. 2d 1123, 1128 (D. Nev. 2004). But *In re Western States* is inapposite on its face. *In re Western States* dealt with an entirely different area of doctrine[11] in the context of an entirely different federal law[12] which did not possess an express preemption clause[13] and had never been found to preempt the state regulations at issue. *Id.* at 1132.

---

[11] That is, the scope of arising under jurisdiction. *In re Western States* dealt with whether regulated entities could remove state law antitrust and unfair competition claims to federal court based on FERC's exclusive jurisdiction over claims under the Natural Gas Act. 346 F.Supp.2d at 1130. The regulated entities' argued, *inter alia*, that the Natural Gas Act field preempted state law created a substantial, disputed federal question such that the regulator's claims arose under federal law. *Id.* at 1137–38. The Court rejected the entities' arguments because the Natural Gas Act did not field preempt natural gas regulation generally or the regulator's claims specifically. *Id.*

[12] The Natural Gas Act.

[13] *See In re W. States*, 346 F.Supp.2d at 1132.

Even if *In re Western States* was applicable, it provides no support to the Director's argument. The question in the portion of *In re Western States* cited by the Director was whether the Federal Energy Regulatory Commission's ("FERC") exclusive jurisdiction over claims under the Natural Gas Act rendered state unfair competition laws field or conflict preempted. The answer in that case was no, because "Defendants' core conduct in these claims is not governed by federal law." *Id.* at 1137. But here, PCHP's core conduct *is* governed by federal standards.

More generally, *Aylward* and *Do Sung Uhm* foreclose the Director's argument that federal standards do not preempt Idaho unfair competition law unless CMS establishes standards specifically governing unfair competition. In *Do Sung Uhm*, for instance, the Ninth Circuit considered whether generally applicable state consumer protection laws were preempted by CMS's marketing standards. 620 F.3d at 1150–53. In holding they were, the Ninth Circuit did not find a CMS standard which generally governed consumer protection. Rather, it looked to the state law plaintiff's theory of the case: the state law plaintiff argued the MA organization defendant violated state consumer protection laws by misrepresenting prescription drug coverage on marketing materials. *Id.* at 1150. But, the Ninth Circuit pointed out, a CMS standard covered the allegedly tortious acts by which Humana allegedly violated state consumer protection law (namely, the content of marketing materials). *Id.* at 1150–51.

Likewise, in *Aylward*, the Ninth Circuit considered whether a federal standard covered the substance of the state law plaintiff's claim (that the MA organization violated a common law duty to timely handle a preauthorization request) rather than its form (a

negligence action). 35 F.4th at 682. To determine whether 42 U.S.C. § 1395w-26(b)(3) preempts state law, the Court must, therefore, look to whether a federal standard governs the conduct by which an MA organization allegedly violated state law. If a federal standard governs the MA organization's allegedly unlawful conduct, the state law is preempted.[14] *Do Sung Uhm* and *Aylward* cannot be colorably read any other way. *See Ahmad v. UnitedHealth Group Incorporated*, 2026 WL 2034036 (9th Cir. July 14, 2026). As discussed above, a federal standard covers each of the acts by which UHC allegedly violated state unfair competition law.[15]

Upon review, the Court finds that *Do Sung Uhm* and *Aylward* squarely control this

---

[14] For the same reasons, the Director's argument that he is attempting to regulate MA organization's *conduct* rather than their *plans*, *see* Dkt. 17, at 4, is unavailing. *See also Aylward*, 35 F.4th at 680 (a state law is "with respect to MA plans" if it conflicts with a federal standard). Binding Ninth Circuit case law does not allow for a distinction between regulating an MA plan or an MA organization. If a federal standard governs MA organizations' conduct—and several do—overlapping state laws are laws "with respect to MA plans." *See Do Sung Uhm*, 620 F.3d at 1148 n.10 (defining standard to include all CMS regulations under Part C). The Tenth Circuit's opinion in *Pharmaceutical Care Management Association v. Mulready* does not command the opposite result. In *Mulready*, the Tenth Circuit confronted an Oklahoma law which regulated the terms under which a pharmacy could be added to a preferred network. 78 F.4th 1183, 1208 (10th Cir. 2023). The *Mulready* court held that regulating the terms of an MA plan fell within the MA preemption statute. The Director argues that, because the *Mulready* court found the MA preemption statute applied to a regulation of the MA plan policy details, and this case does not involve the regulation of an MA plan's policy details, the *Mulready* court would not apply the MA preemption statute here. In doing so, the Director denies the antecedent, a logical fallacy. *Mulready* only supports the Director if it held that a state law regulates "with respect to an MA plan" if and only if it regulates the content of the plan's policy. *Mulready* plainly does not make such a sweeping holding—indeed, *Mulready* construes the MA preemption statute *broader* than the Ninth Circuit does, *see* 78 F.4th at 1206 (characterizing the MA preemption statute as akin to field preemption)—and even if it did, that reading would contradict binding authority in this circuit. *See Aylward*, 35 F.4th at 680.

[15] The Director also argues the Department's memorandum of understanding with CMS—which contemplates information sharing regarding, inter alia, cease and desist orders, means that "CMS places no limitations or restriction on the [Department's] actions." Dkt. 17, at 10–11. The Court does not find this argument colorable, either. An agreement to share information does not, on its face, imply endorsement of every action the parties agree to share information about, nor does federal law authorize CMS to subject insurers to state regulation on a state-by-state basis notwithstanding § 1395w-26(b)(3). CMS certainly does not interpret the memorandum of understanding that way. *See* PCHP Dkt. 14, at 14.

case, and none of the Director's arguments against preemption are colorable.[16]

Accordingly, the Court finds UHC has stated a facially conclusive claim for preemption.

### 4. Adequacy of State Remedies

Although the Court need not address the issue, since it finds UHC has stated a facially conclusive preemption claim, the Court elects to address UHC's argument that state remedies would be inadequate because the Director may revoke its license before a state court can hear its claim. Dkt. 20, at 24–25.

The standards governing UHC's argument are ably stated in *Witzke v. Idaho State Bar*, 647 F. Supp. 3d 943 (D. Idaho 2022) (Patricco, J.). "Generally, state courts are presumed to provide a sufficient opportunity to raise constitutional claims unless state law 'clearly bars' them. *Id.* at 952 (citing *Moore v. Sims*, 442 U.S. 415, 426 (1979)). "The burden rests with Plaintiff to demonstrate that he cannot adequately raise constitutional claims in the ongoing state proceedings." *Witzke*, 647 F. Supp. 3d at 942 (citing *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987))

UHC argues state administrative or judicial proceedings will be inadequate because IAPA allows the Director to initiate delicensure proceedings before Idaho courts can review his Order, citing *Witzke* and two other cases: *Adibi v. California State Bd. of Pharmacy*, 393 F. Supp. 2d 999 (N.D. Cal. 2005) and *Meredith v. Oregon*, 321 F.3d 807 (9th Cir.), *as*

---

[16] *Rosales* provides a useful contrast to this case. There, the Central District of California found preemption was not readily apparent in a § 1395w-26(b)(3) case because the California Department of Managed Health Care raised two colorable issues: whether § 1395w-26(b)(3) immunized brokers rather than simply MA organizations, and whether the Department's actions could fall within the licensing exception to § 1395w-26(b)(3). Unlike in *Rosales*, where the Department raised two colorable arguments against preemption, the Director advances no colorable argument here.

*amended*, 326 F.3d 1030 (9th Cir. 2003). Dkt. 20, at 25. The Director argues in his opening brief that remedies are adequate, but does not address UHC's argument in reply.

State proceedings may be inadequate under *Younger* when it is likely or possible that the regulated entity could suffer injury before a hearing could be held. *See Witzke*, 647 F. Supp. 3d at 944 (state proceedings inadequate because a combination of strict deadlines regarding the transferability of an MBE score with the indefinite timeframe for appealing an adverse character and fitness determination made it possible that the character and fitness appeal would be decided after the strict deadline rendered a bar applicant's application moot); *Adibi*, 393 F. Supp. 2d at 1009 (state proceedings inadequate because license revocation could occur before judicial review could be had); *Meredith*, 321 F.3d at 818–20 (state proceedings inadequate because the litigant could not raise constitutional claims before the ALJ and the ALJ's decision could go into effect before a stay was decided).

Here, Idaho law requires the Director to conduct a hearing prior to delicensing an insurer for failure to obey a lawful order. Idaho Code § 41-327(1). The filing of a petition for review does not automatically stay the effectiveness of a final order. Idaho Code § 67-5274. If the Director suspends an insurer's license, it may remain suspended until the district court disposes of the motion for stay. "For *Younger* abstention, the adequacy of the opportunity to litigate the federal claim in a state proceeding requires that such opportunity be timely—*i.e.,* prior to the administrative deprivation." *Adibi*, 393 F. Supp. 2d at 1009–10. Since UHC "could be left without a pre-deprivation remedy," *id* at 1009, the Court finds the state law remedies in this case inadequate.

MEMORANDUM DECISION AND ORDER - 28

The Director's Motion to Dismiss is, therefore, DENIED.

## C. Preliminary Injunction

With that, the Court turns to UHC's request for a preliminary injunction. By finding UHC has made out a facially conclusive preemption claim, the Court necessarily finds it likely to succeed on the merits. If UHC can show the other three *Winter* factors are met, it is entitled to a preliminary injunction.

### 1. Irreparable Harm

An injunction is an equitable remedy and will not issue if the plaintiff has an adequate remedy at law. *See Winter*, 555 U.S. at 22. As the Court noted in its prior Order, UHC is threatened with the allegation that it is violating Idaho law on fair competition, laws which do not apply to it. The resulting threat to its business reputation is an intangible harm that cannot be estimated or remedied after the fact. *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1057–58 (9th Cir. 2009). The Court accordingly finds irreparable harm here.

### 2. Balance of the Equities and the Public Interest

Finally, UHC must show that the balance of equities and the public interest favor temporary relief. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 695 (9th Cir. 2023). Since the Director opposes relief, the balance of the equities and public interest merge. *Id.* As the Court previously acknowledged, promoting fair and accessible market activity is in the interest of the people of Idaho. Nonetheless, the federal public interest in a nationally consistent regulatory scheme for MA

plans—and the Constitutional interest in upholding the Supremacy Clause—supersedes the Director's interest. *Am. Trucking Assoc's*, 559 F.3d at 1059–60.

Because the Court finds that UHC has met each of the *Winter* factors, the Court GRANTS the Motion for Temporary Restraining Order and ENJOINS the Director from enforcing the Order against UHC.

## V. CONCLUSION

The Court does not dispute that Idaho may have serious concerns regarding the conduct of UHC and similarly-situated MA organizations. Nor does the Court take a stance on whether the application of federal preemption in this case is good for the people of the State of Idaho. The Court's holding is simply this: under controlling Ninth Circuit and Supreme Court case law, neither *Ex parte Young* nor *Younger* require the case to be dismissed, and the Director's actions run afoul of the Medicare Advantage preemption statute.

## VI. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.      UHC's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 10) is GRANTED. The Director is ENJOINED from enforcing the Order in any subsequent proceedings before the Department or Idaho courts. The Director is FURTHER ENJOINED from initiating actions to sanction UHC on the theory that UHC violated Idaho unfair competition or unfair business practices law by withholding or terminating broker compensation, by removing enrollment forms or other materials from its website, or by otherwise obstructing Idaho residents from accessing enrollment forms or other materials.

MEMORANDUM DECISION AND ORDER - 30

2.      The Director's Motion to Dismiss (Dkt. 14) is DENIED.

DATED: July 31, 2026

David C. Nye
U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 31